UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SEA LINK CARGO SERVICES, INC.            CIVIL ACTION

VERSUS            NO. 08-1452

MARINE CENTRE, INC.            SECTION "A"(2)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for trial before the Court, sitting without a jury, on March 9, 2009. Following the close of all evidence, the Court took the matter under advisement and instructed counsel to submit their post-trial memoranda no later than March 20, 2009.

Having now considered the pleadings, evidence offered at trial, arguments of counsel, and applicable law, the Court renders its Finding of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent certain findings of fact are more appropriately classified as conclusions of law, they should be so construed. To the extent certain conclusions of law are more appropriately classified as findings of fact, they should be so construed.

## FINDINGS OF FACT

Plaintiff Sea Link Cargo Services, Inc. ("Sea Link") is a marine equipment broker whose business focuses primarily on moving freight on the River. Sea Link is owned by Mr. Jerry

Courville.

Defendant Marine Centre, Inc. ("MCI") is a maritime business that focuses on all aspects of the marine industry, including the operation of push boats. MCI is owned in part by Mr. Alan Savoie. Savoie has worked in the marine business since 1972.

Courville and Savoie had known each other and transacted business together for several years prior to the contract that gave rise to this lawsuit. MCI had often done towage work for Sea Link.

In January 2006, Savoie received a call from Info Tech Systems ("ITS") requesting barges that would be used to move mud to rebuild levees in the aftermath of Hurricane Katrina. ITS was the primary contractor for this service with the Corps of Engineers.

Savoie contacted Courville about chartering several barges that Savoie intended to subcharter to ITS for use in the mud project. On January 16, 2006, Courville sent an email to Savoie that contained proposed terms for the Sea Link/MCI charter. (Tr. Exh. 6). Savoie replied his assent to the proposed terms, (Tr. Exh. 7), and on January 17, 2006, Sea Link and MCI entered into an agreement or charter party for 6 open hopper barges (Tr. Exh. 1).

The agreement required MCI to pay a daily rate of $250.00 per day, per barge. By agreement, the daily rate increased to

$350.00 per day, per barge on August 20, 2006.

Sea Link had obtained the barges via an unrelated charter party with Canal Barge Co. ("CBC"), the actual owner of the barges. MCI knew that Sea Link was acting as a broker and did not own the barges. MCI re-charted the barges to ITS for use in the mud trade.

Courville expressly warned Savoie of the significant damage that could result to the barges if the wrong equipment were to be used to discharge materials. (Tr. Exhs. 8A-B, 14). On the day that the charter agreement was signed, Courville reiterated to Savoie via email that the barges were restricted to clamshell bucket discharge only. (Tr. Exh. 14). Savoie received these warnings. Further, the charter party itself specifically provides that only clamshell buckets are to be used for discharge of materials. (Tr. Exh. 1 ¶ 5).

On March 29, 2006, CBC issued a new Barge Order Form to Sea Link increasing the value on each barge to $415,000, effective April 1, 2006. (Tr. Exh. 26). Courville testified that he recalled a conversation in which he advised Savoie of the increase in value but the evidence supports Savoie's contention that he did not learn of the increase until a November 2, 2006, fax. (Tr. Exh. 26).

In April or May 2006, Savoie learned that four of the barges had been damaged while in ITS's custody by use of an excavator to

discharge mud--the precise hazard that Courville had warned against. The damage to the barges, as revealed by a July 2006 marine survey, was extensive. (Tr. Exh. 114). The damaged barges were the CBY253, CBY256, CBY257, and CBY259. Savoie did not know exactly when the damage had occurred except that it occurred sometime between January 26, 2006 (the date of the ITS charter party (Tr. Exh. 124)), and April/May 2006 when a routine marine survey revealed the damage. Savoie had not been informed about the increase in value until after the barges had already been damaged. ITS continued to use the barges in the mud project notwithstanding the damage.

The mud project ended near the end of June 2006 and MCI began using the barges in the pipe trade to move pipe from Houston to Shreveport for Cooper T Smith. It is undisputed that the barges were suitable for use in the pipe trade notwithstanding the extensive damage.

The Sea Link/MCI charter party contained the following damage clause:

> Barge Damages – Any damages to barges tendered while on-hire status will be the responsibility of MCI to return barges in like conditions as presented prior to on-hire status. If barges require repair, barges will remain as oh-hire status until repaires [sic] are completed to satisfaction of barge(s) [sic] owners.

(Tr. Exh. 1).

MCI did not pay Sea Link for the charter of the barges from July 2006 forward. Savoie did not think this significant because

Sea Link and MCI each owed the other on open account and were basically using each other's money.

The Sea Link/MCI charter party contained the following duration clause:

> On-hire period – appx. Thirty (30) days with five (5) days notice for return.

(Tr. Exh. 1). This meant 30 days hire +/- such that if Courville were to determine that he needed the barges back either side of 30 days he would give Savoie 5 days notice to get the barges cleaned, surveyed, and returned. (Tr. Exh. 11).

On November 28, 2006, Sea Link issued a notice to MCI that the barges were to be returned in accordance with the January 17, 2006, contract and that "all contract provisions be duly implemented." (Tr. Exh. 31). On December 11, 2006, Sea Link agreed that MCI would be allowed one last trip with the CBY barges pursuant to the terms of the January 17, 2006, contract. (Tr. Exh. 35). Sea Link stated that upon completion of this last trip, the barges must be returned for immediate repair. (Id.).

On January 20, 2007, (CBY253) and February 25, 2007, (CBY256, CBY257 & CBY259) the CBY barges were fleeted at the Upper St. Rose Fleet to await repairs. Savoie manages the Upper St. Rose Fleet for Cooper T Smith.

As of February 2007, Sea Link owed MCI $189,072.34 and MCI owed Sea Link $283,496.00. (Tr. Exh. 40). On April 20, 2007, Sea Link and MCI entered into an offset agreement along with a

5

cash payment by MCI to Sea Link. (Tr. Exh. 116). This arrangement brought all accounts current for both parties as of March 31, 2007. Thus, MCI paid Sea Link the on-hire charter due on the CBY barges through March 31, 2007.

Sea Link's contractual obligations to CBC remained unaffected by the status of payments between Sea Link and MCI. (Tr. Exh. 65). Sea Link asked CBC for relief on the charges that it had to pay for the barges because MCI was not paying Sea Link. (Tr. Exh. 81). CBC denied any such relief and Sea Link was forced to pay all of the charges for the barges until MCI could return the barges to Sea Link in their repaired state, this notwithstanding that MCI made no on-hire payments to Sea Link after the parties' April 20, 2007, offset agreement.

Savoie contends that he asked Courville if he could continue to use the barges in the pipe trade while they were fleeted awaiting repairs. Courville denies any such specific request. Considering the parties' penchant for email exchanges, it is troubling that there exists no written evidence of any such request particularly in response to the numerous emails from Courville seeking payment of the daily on-hire charges. Savoie does allude to such a request in a June 29, 2007, email to Courville so the Court is persuaded that at some point Savoie did ask about using the barges, although nothing in the record suggests that he ever believed that he was entitled to do so or

6

that he pressed the issue with Courville.  (Tr. Exh. 80).

Further, although the barges did ultimately lay idle in the fleet for nearly five months awaiting repairs, there is no evidence that anyone, including Savoie, knew when he fleeted the barges in January/February 2007 that the repairs would not begin until July of that year.  In fact, when the barges were first fleeted Savoie had been in the process for sometime of working to get the insurance claims paid.  (Tr. Exh. 54).  Not only is there virtually no evidence that Savoie pursued the issue of using the barges in lieu of fleeting them but factually there is little reason to believe that he would have pressed the issue in light of the fact that everyone thought that repairs would be imminent and no one could have known that the barges would ultimately remain fleeted for 5 months.

On July 11, 2007, the CBY257 was placed in C & C Marine for repairs.  On July 22, 2007, the CBY253 and CBY259 were placed in the yard for repairs.  On August 28, 2007, the CBY257 and CBY259 were released and the CBY 256 was placed in the yard for repairs. On August 29, 2007, the CBY253 was released from the shipyard. On September 1, 2007, the CBY253, CBY257, and CBY259 were returned to Sea Link.  On October 11, 2007, the CBY256 was released from the yard and returned to Sea Link.

The barges were ultimately repaired and completed to the satisfaction of the barge owner, CBC.  MCI does not dispute that

it owes the daily on-hire rate for the time that the barges were in the repair yard.

## CONCLUSIONS OF LAW

This is an admiralty and maritime claim. The Court has original subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1333.

Sea Link is asserting a marine collection claim for payment of unpaid charter hire that it claims is owed by defendant MCI. Sea Link seeks charter hire totaling $228,550.00, which represents the daily rate on the 4 CBY barges from April 1, 2007, through the date that the barges were returned to Sea Link/CBC from the repair yard. Sea Link also seeks attorney's fees, prejudgment interest, and court costs, all in accordance with La. R.S. § 9:2781. MCI concedes that it owes charter hire for the days that the barges were in the repair yard.

MCI has brought a counterclaim against Sea Link for $29,009.61 for unpaid towing services rendered by the M/V CELINA MARIE from April 29, 2007, through May 6, 2007. The towing services are not related to the unpaid charter hire dispute with the CBY barges. Sea Link does not dispute the validity of the charges and contends that they should be offset against the sums owed to Sea Link by MCI.

MCI also counterclaims that the charter party obligated Sea Link to allow MCI to use the CBY barges for additional commercial

activity in lieu of fleeting them. MCI seeks lost profits from the ability to use the barges, reimbursement for the additional expenses it incurred by having to charter barges to replace the CBY barges, and the fleeting charges incurred while awaiting repairs.

The central issue before the Court is the determination of the "on hire" or "off hire" status of the four CBY barges after they were taken out of service by Sea Link until they could be placed in the shipyard for repairs. The Sea Link/MCI charter party was clearly a maritime contract and as such it is governed by maritime law.

Maritime contracts are subject to the general rules of contract interpretation. See Marine Overseas Servs., Inc. v. Crossocean Shipping, Co., 791 F.2d 1227 (5th Cir. 1986). Under maritime law a contract must be read and interpreted as a whole; the words of the contract are to be given their plain and ordinary meaning. Burlington N. Santa Fe RY v. Parker, No. 06-1358, 2007 WL 4180595 (W.D. La. Nov. 21, 2007) (citing Davis v. Gulf Oil Corp., 919 F.2d 313, 315 (5th Cir. 1991); La. Land & Explor. Co. v. Offshore Tugs, Inc., 23 F.3d 967, 969 (5th Cir. 1994)).

Pursuant to the Sea Link/MCI charter party, Sea Link is entitled to charter hire for the 4 CBY barges from April 1, 2007, through the date that each barge was returned to Sea Link from

9

the repair yard. The charter party provides that in the event of damage to the barges, they were to remain "as on hire status" until the repairs were completed to the barge owner's satisfaction. (Tr. Exh. 1). This means that MCI would be required to pay the daily charter for the barges during the time that the barges could not be returned to Sea Link, and concomitantly the owner, in light of damages sustained while the barges were chartered to MCI.

MCI had no legal right to use the barges after the final trip in the pipe trade, notwithstanding that the barges were suitable for that use and that MCI was obligated to pay the on-hire charges. The charter party had an on-hire period of thirty days, with five days notice for return. (Tr. Exh. 1). Sea Link issued the notice of return well after the barges had been chartered for thirty days, and regardless of the reason that Sea Link chose to recall the barges, MCI's contractual obligation was to immediately begin the necessary steps to return the barges because the contract only allowed for 5 days notice. In fact, when Sea Link agreed to one last trip with the barges in the pipe trade, a concession it was under no legal obligation to grant, it was conditioned upon "return and immediate repair" of the barges upon completion of the transit. (Tr. Exh. 35).

The charter party required MCI to pay for the barges during the time that they could not be returned to the owner in light of

10

damages sustained while the barges were on-hire to MCI. MCI concedes that it must pay charter hire for the time that the barges were in the repair yard, and had the barges been put in for repairs immediately upon return from their final transit then there would be no dispute. The primary reason that the barges could not be immediately repaired is because MCI did not have the funds to pay out of pocket for the extensive damage inflicted by ITS and this forced MCI to await the outcome of ITS's claim against its insurer.

There is no evidence that Sea Link did anything to delay the barges from entering the repair yard. MCI explained that the insurance negotiations were made more difficult because the barges were so severely damaged that they were dangerously close to being declared a constructive total loss ("CTL"). MCI explained that the issue of CTL could have been avoided if Sea Link had timely advised MCI that CBC had revalued the barges at $415,000.00, effective April 1, 2006.

Sea Link should have advised MCI about the new valuation at the same time that it advised MCI that the daily rate would be increasing to $350.00. However, the Court can discern no causal connection between Sea Link's failure to advise MCI about the new valuation and MCI's increased difficulties in light of the CTL issue because Savoie did not know exactly when the damage had occurred except that it occurred sometime between January 26,

11

2006, and April/May 2006 when a routine marine survey revealed the damage. Because the new valuation was only effective as of April 1, 2006, it is far more likely than not that the barges had already been damaged when the new valuation became effective. Thus, even if Sea Link had timely advised MCI about the new valuation it would have been too late to increase the insured value in conjunction with the damages that had already been sustained.

MCI's contention that the barges were either "off-hire" while fleeted, and therefore it owes no charter hire, or if they were "on-hire" then Sea Link breached its obligations to MCI to allow it to use the barges is legally incorrect. Under the charter party, when the barges are "on-hire" then the daily charter rate is payable, but on-hire status does not ipso facto entitle MCI to use the barges. This point is made clear in the damage provision, which deems the barges to be "on-hire" while undergoing repairs. It is physically impossible to submit the barges to a shipyard for repair and yet continue to use them at the same time. In the context of a barge that cannot be returned when recalled in light of damage sustained, the term "on-hire" in this agreement simply means that the charterer will continue to bear the burden of the daily charter hire rate until the barges are repaired to the owner's satisfaction.

When the damage provision is triggered as it was in this

12

case, the term "on-hire" does not carry with it entitlement to continue to use the barges for some other purpose. The on-hire damage provision was put in the contract to ensure that if MCI damaged the barges, then it would continue to be responsible for charter hire during the time that the damage prevented Sea Link from returning the barges to the owner. This was important because Sea Link remained obligated to continue to pay its own daily charter hire fees to CBC regardless of whether MCI was using the barges or not. Again, the primary reason for the delay in repairing the barges was MCI's inability to cover the cost of repairs out of pocket. MCI cannot avoid its contractual obligations to Sea Link by relying upon a circumstance that it created.

Although the charter party is not ambiguous as to the meaning of "on-hire" status, if the Court were to look to the parties' conduct surrounding the issue then it would be even clearer that MCI understood the meaning of "on-hire" status as being consistent with the Court's findings. Clearly, it was Savoie's understanding, prior to consulting an attorney, that the January 17, 2006, agreement required him to pay the daily on-hire rate for the barges even though they were fleeted. Although Savoie attributed his payment of any on-hire charges after fleeting to mere "mistake" or "error" on his part, such an assertion is not credible. The numerous email exchanges

13

submitted at trial demonstrate that MCI never questioned that it owed Sea Link for the daily on-hire rate during the time that the barges could not be returned to Sea Link because of the damages, and had in fact expressed its intention to pay Sea Link. (See, e.g., Tr. Exh. 42; 85; 91; 94; 96; 100; 104; 106). Further, Savoie assured Courville that the accumulating on-hire charges were being submitted as part of the insurance claim on the damaged barges. (Tr. Exh. 60). Clearly, Savoie believed that Sea Link was owed on-hire charges and Savoie only first resisted payment after Sea Link finally threatened to take legal action. (Tr. Exhs. 109; 110).

Sea Link did not fail to mitigate its damages by declining to allow Savoie to use the barges in lieu of fleeting them pending the repairs. As previously noted, it is hardly clear that Savoie pressed the issue of using the barges, and assuming that he did, Sea Link was not required to allow him to use the barges during the time when MCI could not meet its own legal obligation to repair and return the barges. As noted, it was MCI's own financial difficulties that delayed the repairs and ultimately caused the barges to lay idle for nearly 5 months. Scheduling with the repair yard possibly contributed to a small amount of delay but the primary reason for the extended delay was MCI's financial constraints.

Further, the barges were extensively damaged and were in

need of repair.  Even though the barges could have been used in the pipe trade, the barges would have possibly been unsuitable for another purpose had CBC required Sea Link to release the barges for another charterer.  The repairs were going to be expensive and Sea Link, who was directly responsible to the barge owner, had every right to require that MCI expeditiously make good on the damage that it was already liable for before being allowed to put the barges to further use.  Savoie testified at trial that the turn around time on a pipe trade transit was about 3 weeks which means that if the shipyard were ready to take the barges for repairs, the CBY barges could lose their place in line awaiting their return in the pipe trade.

MCI elicited testimony from CBC's Doug Downing suggesting that CBC was not pressing Courville for the return of the barges, contrary to what Savoie claims that Courville told him.  Sea Link's reasons for recalling the barges are not relevant under the charter party.  The notice to return the barges was issued in accordance with the charter party and MCI's contractual return obligations were triggered.  The Court notes, however, that the evidence of record demonstrates that CBC was very interested in getting its barges repaired and returned.  (Tr. Exhs. 33, 59 & 64).  And again, CBC made it clear that Sea Link would remain responsible for its obligations under the CBC/Sea Link charter regardless of whether MCI paid the charter hire.

The Court does not find that Sea Link acted unreasonably or vindictively in recalling the barges and allowing only one transit in the pipe trade. The emails between the parties are legion and the tenor of emails demonstrates that Sea Link was clearly trying to work with MCI throughout the ordeal but that Sea Link needed to get paid because it continued to pay CBC for the barges which could not be returned in light of the repairs that MCI was obligated to make.

Based on the foregoing, judgment will be awarded in favor of Sea Link and against MCI on its claim for payment of unpaid charter hire totaling $228,550.00, which represents the daily rate on the 4 CBY barges from April 1, 2007, through the date that the barges were returned to Sea Link/CBC from the repair yard.

MCI's counterclaim for $29,009.61 for unpaid towing services rendered by the M/V CELINA MARIE from April 29, 2007, through May 6, 2007, will be recognized via an offset against Sea Link's judgment on the collection claim. Judgment will be rendered against MCI on the remaining claims asserted in the counterclaim, including the claim for attorney's fees.

Jurisdiction over this admiralty and maritime claim is based solely on the Court's admiralty jurisdiction and this dispute is governed by admiralty law which generally does not award attorney's fees to a prevailing party. Therefore, the Court is

persuaded that neither party can recover attorney's fees under Louisiana law. See McGinnis, Inc. v. Mariner Trans., Inc., No. 92-794, 1992 WL 124798 (E.D. La. May 28, 1992).

In admiralty cases, prejudgment interest is awarded at the discretion of the trial court. Curry v. Fluor Drilling Servs., Inc., 715 F.2d 893, 896 (5th Cir. 1983). Sea Link paid all of the charter hire to CBC for the 4 CBY barges yet received no payments from MCI after April 1, 2007. MCI in effect had free use of Sea Link's money during the time that it should have been paying for the daily charter hire. Accordingly, Sea Link will be awarded prejudgment interest on a principal amount of $199,540.39 ($228,550.00 less the $29,009.61 owed to MCI), from the date of judicial demand which was February 28, 2008, at the rate of 3% per annum which is less than the rate applicable to delictual actions under state law but greater than the post judgment interest rate provided by 28 U.S.C. § 1961.

MCI will bear the costs of the proceedings.

Judgment will be entered accordingly.

April 22, 2009

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE